THE FARMERS' & MECHANICS' BANK *v.* JACOB K. DRURY, AND TRUSTEE, DANIEL H. MACOMBER, AND CLAIMANT, THE MIS* SISQUOI BANK.

*Trustee Process. Promissory Notes. Banks.. Discount. Notice.*

The principal debtor, at the time the trustee executed certain promissory notes to him, informed the trustee that he might wish to pass the notes to some banks, as collateral security, and in that connection mentioned the claimant and two other banks, and the trustee consented that the notes might be so used. Afterwards the defendant passed the notes to the claimant as *collateral security* for certain discounts which he obtained from the claimant on the faith of such security, and before the service of the trustee process he informed the trustee, though not by direction or in behalf of the claimant, that the notes were in the latter's hands. *Held*, that such notice to the trustee was not sufficient to protect the notes from attachment by the trustee process in favor of the creditors of the principal debtor.

*Held*, also, that the notes were not *discounted* by the claimant, within the meaning of the act of 1852, (Acts of 1852, No. 4, p. 4,) so as to render unnecessary a notice to the trustee by the claimant of the transfer of the notes, in order to protect them from attachment by the trustee process.*

TRUSTEE PROCESS. The commissioner found the following facts :

On the 28th of March, 1861, the trustee for a sufficient consideration executed and delivered to the defendant two promissory notes of that date, one for seventeen hunnred dollars, payable on or before March 1st, 1862, and the other for eight hundred dollars, payable on or before September 1st, 1862, both payable to the principal debtor or bearer, which notes had not been paid.

Some days prior to the execution of these notes, Drury, the defendant, called upon the cashier of the Missisquoi Bank, and, stating that he expected to have some promissory notes against the trustee, on or about the 1st of April following, proposed to make an arrangement with the bank for discounts, and to send the notes, which he so expected to have against the trustee, to the bank, as collateral security for his liabilities to the bank

---

*NOTE.—*Aliter* now by statute; see General Statutes, chap. 34, sec. 47.— REPORTER.

growing out of such discounts ; which proposition was accepted, and on the same day the bank, relying upon the promised security, discounted for him his draft on Boston for one thousand dollars.

Pursuant to this arrangement, on the 12th April, 1861, Drury sent to the claimant, the Missisquoi Bank, the two notes above described, having endorsed them in blank, and they remained in the possession of the claimant up to and at the time of the hearing before the commissioner.

Between the 12th April and 26th May, 1861, the Missisquoi Bank, relying upon the responsibility of Drury and the security afforded by the two notes above mentioned, also discounted two other drafts for Drury for one thousand dollars each, drawn by him on Boston ; which drafts, as well as the one before mentioned, were still held by said bank, and had not been paid.

At the time of the execution of said two notes, or soon afterwards, the trustee was informed by Drury that he might wish to pass them to some banks as collateral security, and in that connection mentioned two banks in Burlington and the Missisquoi Bank, and the trustee consented that the notes might be so used.

On the 26th, and also on the 27th May, 1861, the trustee was informed by Drury that the notes in question were at the Missisquoi Bank ; and on the 31st of the same month, Homer E. Hubbell, the attorney and a director of said bank, called on the trustee with the notes, and informed him that they were held and owned by that bank. The writ in this case was served on the trustee May 28th, 1861.

Upon these facts the county court, at the April Term, 1862, PIERPOINT, J., presiding, *pro forma* adjudged the trustee not chargeable, and decided that the claimant was entitled to the fund in the trustee's hands, to which the plaintiff excepted.

*S. Wires* and *Wm. G. Shaw*, for the plaintiff.

*Peck & Colby*, for the claimant.

POLAND, CH. J. The report of the commissioner shows that no notice of the transfer of the trustee's notes to the claimant,

by the principal debtor, had been given to the trustee, prior to the service of the trustee process, except by the principal debtor himself, and it does not appear that such notice was given at the request or on behalf of the claimant. Such notice was therefore insufficient to protect the notes in the hands of the claimant against a trustee attachment, as has heretofore been held ; *Peck* v. *Walton and Trustee,* 25 Vt. 33 ; *Webster* v. *Moranville and Trustee,* 30 Vt. 701.

The claimant, however, insists that the notes were held in such manner, that no notice of transfer was necessary to the trustee to protect the notes against a trustee attachment :

Firstly, by reason of what passed between the trustee and principal debtor, at the time of the execution of the notes, or soon afterward, that the principal debtor said he might wish to pass the notes to some bank as collateral security, and mentioned the claimant among other banks, and the trustee consented he might so use them. This claim is made upon the ground that the case falls within the decision in *Downer* v. *Marsh and Trustee* 28 Vt. 558.

But an examination of that case readily shows, that there is no analogy between the cases. In that case the claimant was present when the note was given, and it was executed for the very purpose of being delivered to the claimant, to pay a debt the principal debtor owed him, and the business was all completed in the presence of the trustee, except that the precise amount due to the claimant from the principal debtor had not been ascertained.

The court held that no further notice of transfer was necessary. We think it might well have been put upon the ground that there was no transfer, but that the note was executed directly to the claimant.

But here the facts are wholly different; it was uncertain whether the principal debtor would transfer the notes at all, or if he did conclude to do so, to what bank, and from what was then said between him and the trustee, the trustee had no more ground to expect the notes would go into the claimant's hands, than those of two other banks, and either of those banks would have had equal grounds to set up title to the notes, that the claimant

has under this arrangement, if the notes l ad been transferred to them.

Secondly, the claimant insists that no notice of the transfer of the notes was necessary, because these notes had been transferred to, and discounted by the claimant, and so were protected against a trustee attachment, by the act of 1852.

These notes had been transferred to the claimant, in such manner, and upon such consideration, that if sufficient notice of the transfer had been given, before the service of the trustee process, the title of the claimant would have been protected against it. If, therefore, the true meaning of the act of 1852 was to excuse banks from the necessity of giving notice in all cases, where they were holders of negotiable paper by such title as would be available to all persons with notice, then the claimant's title to these notes should be protected. But a careful reading of the statute satisfies us, that the statute was not intended to have so broad a scope. To excuse notice, the paper must not only be negotiated and transferred to a bank, but it must be *discounted by the bank.*

If paper is transferred to a bank as collateral security for a debt already existing, such transfer would be good against a trustee attachment, if the proper notice were given, but no one would claim that such paper is discounted by the bank.

The claimant insists that the facts reported show that these notes had been *discounted at the bank.*

The bank had discounted a draft for one thousand dollars for the principal debtor, before receiving the notes of the trustee, and two drafts of a thousand dollars each afterwards, and held the trustee's notes as collateral security for the payment of these drafts. But when the first draft was discounted the bank relied on Drury's promise to furnish the security of the notes, and when the other drafts were discounted they relied upon the security of these notes then in their hands. The claimant's counsel insists, that this was a discount of these notes, within the fair intent and meaning of that term in the statute; that if they relied upon the credit and security of these notes when they advanced money to Drury on his drafts, that is a discount of the notes.

It is not claimed that the bank had become the purchaser of

these notes, or advanced their money for them. They purchased or discounted Drury's drafts, and those drafts represented their debt against him. The drafts were for different sums, and were payable at different times from the notes. They held the notes as collateral security merely for the payment of the drafts, and if the drafts were paid either by Drury or the drawee and acceptor, the notes were the property of Drury.

The statute, we think, was carefully drawn so as to extend only to cases where banks have advanced their money for, and become the purchasers and owners of, the securities, and that it can not be extended to cover, and excuse notice in, cases where they take paper merely as collateral security for paper which they have discounted.

Our statute requiring notice of transfer of negotiable paper, in order to protect it against trustee process, was a great clog upon the negotiability of paper, but in this state its operation bore more severely upon banks, and those dealing with them, than others, because their dealings in such securities were more extensive than those of all others in the state, and hence the statute of 1852 relieving banks from the necessity of giving notice.

But it was only intended to relieve the banks whils pursuing the ordinary and legitimate business of discounting or purchasing negotiable paper, and advancing their money for it, and when they take it merely as collateral security, or in any other mode than ordinary discount, to leave them subject to the same burden as private persons, or other corporations.

The result is that the judgment of the county court, that the trustee is not chargeable, and that the claimant is entitled to the fund, is reversed, and judgment is rendered that the trustee is chargeable, and that the plaintiff recover costs against the claimant.